NOT FOR PUBLICATION                                    (Docket Nos. 23 & 29)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____
                                        :
KATHLEEN DECREE,                        :
                                        :    Civil No. 07-3674 (RBK/AMD)
            Plaintiff,                  :
                                        :
      v.                                :
                                        :    **OPINION**
UNITED PARCEL SERVICE, INC., et al.,    :
                                        :
            Defendants.                 :
_____ :


**KUGLER**, United States District Judge:

        This matter comes before the Court on a motion by Defendant United Parcel Service

("Defendant" or "UPS") for summary judgment on all claims alleged against it in the Complaint

of Plaintiff Kathleen Decree ("Plaintiff" or "Decree").  Plaintiff's Complaint includes allegations

against Defendant pursuant to the New Jersey Law Against Discrimination, N.J. Stat. Ann. §

10:5-1, et seq. ("LAD"), the New Jersey Workers' Compensation Statute, N.J. Stat. Ann. §

34:15-1, et seq., and the common law.  Plaintiff has filed a cross-motion for partial summary

judgment as to its LAD and breach of contract claims.  For the reasons expressed below, the

Court will grant in part and deny in part Defendant's motion.  Plaintiff's motion will be denied.

I.      **BACKGROUND**

        A.      **Decree's Work for UPS**

        Decree began working for UPS as a package driver in 1987.  She steadily rose through the

1

employment ranks, holding such positions as Supervisor Human Resources/Acting Manager, On-Car Supervisor, Preload Supervisor, Saturday Air Supervisor, International Supervisor, Vineland Business Manager, United Way Loan Executive to Southeastern United Way, and Midnight Manager of Philadelphia Air Hub.  Most recently, from 2000 to 2007, Decree held the position of Business Manager of the Marlton Center, located within the Lawnside Division.

Decree's daily responsibilities as Business Manager of the Marlton Center included delegating responsibilities and assignments to subordinates, attending labor meetings, and supervising subordinates' training, safety, and occupational development.  The physical aspects of her position included (1) the simple hand grasping, manipulation, and reaching associated with office tasks; (2) the lifting, lowering, pushing, and pulling associated with package handling; and (3) traveling by car to attend meetings, conduct customer visits, meet distressed package drivers, and follow drivers to audit compliance with training.  Plaintiff's workload predictably increased by several orders of magnitude twice a year during the peak seasons of Christmas and Summer.

The parties dispute the centrality of the physical aspects of Plaintiff's job.  UPS maintains a document that describes the "essential job functions" of an Operations Supervisor/Manager to include: "travel by car and plane to attend meetings at other locations and call on non-UPS locations and customers," as well as "[l]ift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds" and "[a]ssist in moving packages weighing up to 150 pounds."  (Def.'s Br. at Ex. 5.)  The description notes that:

> The essential function of this job may vary greatly depending upon the size and the location of the UPS facility.  At some locations, employees may not perform all of the essential job functions listed above.  At other locations, employees may perform some or all of the functions listed above, and in addition, may be required to perform other jobs or tasks as directed.

(Id.)  On the other hand, Decree contends that, in actuality, she only occasionally handled packages, and then, only when necessary to assist the supervisors and other UPS employees who were primarily responsible for doing so.  Decree admits that her job required her to frequently travel by car – sometimes as far as three hundred miles a day – but disputes the frequency with which she was required to travel long distances and indicates that driving responsibilities were often divided amongst the various managers utilizing a car-pooling system.

**B.     Decree is Injured in an Automobile Accident**

On December 9, 2005, Decree drove to Leisuretown, New Jersey to assist a UPS part-time supervisor who was struggling with her job performance.  On her return trip, she was involved in an automobile accident and sustained physical injuries.  Shortly after the accident, Decree informed her immediate supervisor, Al Carlino, who allegedly instructed her to file for benefits under her personal liability insurance.  Decree did not immediately file for workers' compensation.  She attributes this failure to her belief that a manager should not ordinarily file for workers' compensation and the pride she took in the Marlton Center's record of workplace safety.  Decree continued to work at UPS until January 18, 2006**,** during which time she wore her arm in sling.

On January 18, 2006, Decree filed for and received workers' compensation benefits, which were administered by UPS's workers' compensation administrator, Liberty Mutual.  As a consequence of filing for workers' compensation, Decree ceased reporting for work.  Decree alleges that this prompted Mr. Carlino to angrily inform her that "nobody is going out on worker's comp on my time," and that if she did not report to work the following morning he

would come to her home and "drag" her back.  (Dep. of Decree at 179:4-5.)  Apparently, Mr. Carlino called Plaintiff again later that evening to rescind his threats and to inform her that she would be temporarily replaced, but that the position would be held open for her upon her return.

### C.    Decree's Leave of Absence

Throughout the duration of Plaintiff's time on workers' compensation, her medical progress was tracked by Liberty Mutual.  From time to time, Liberty Mutual would make condensed information regarding Plaintiff's progress available to UPS through an online computer program known as Risk Track.  Through Risk Track, UPS's case manager John S. Jordan accessed and reviewed these records.  Amongst other things, these records reflect scheduled physician appointments, diagnoses, and projected return dates.  Decree's physicians diagnosed her with a full thickness chest tear and brachial plexus irritation.  To properly treat her conditions, her physicians delayed shoulder surgery until November 2006.

UPS provides its employees with a Flexible Benefits Plan ("FBP").  The FBP includes income protection coverage of short-term and long-term disability, as well as a return-to-work program.  Pursuant to the FBP, any employee who remains on a leave of absence for longer than twelve months is administratively terminated.  On December 1, 2006 – as Decree neared the end of the twelve month period – UPS sent her a letter alerting her that UPS had "received notification that you requested a job-related accommodation because of a self-reported physical or mental condition."  (Def.'s Br. at Ex. 13.)  UPS enclosed forms to be completed by Plaintiff's physician which would enable UPS to assess the possibility of an accommodation.  UPS's letter warned that speed was of the essence and that a failure to return the forms within four weeks would be regarded as a withdrawn request.  Plaintiff did not send any medical information to

UPS pursuant to this request and wrote on the form "I did not request this!!"  (Id.)

On December 17, 2006, Plaintiff's physician, Dr. Barbara G. Frieman, determined that Plaintiff could return to work on light duty starting January 3, 2007.  Dr. Frieman prepared a physician's release for Decree, which read "Kathy can go back to work on January 8th 2007 to Light Duty – limit Lifting, pushing + pulling with Rt. Arm.  No Repetitive Reaching and Local Driving only" (the "Release").  The Release did not define "local driving," but Plaintiff testified that her understanding was that local driving meant a distance of roughly twenty miles.

On December 29, 2006, UPS sent another letter to Decree, reiterating its need for medical information to analyze the possibility of accommodations.  Nevertheless, Plaintiff did not comply because, as she explained, "I didn't believe myself to be disabled and I wasn't going to be permanently disabled that I could not perform my job."  (Dep. of Pl. at 212:9-14.)

### D.    Decree Attempts to Return to the Job

Upon receipt of the Release, Decree contacted District Nurse Betsy Sullivan to inform her of Decree's desire to return to work.  On December 22, 2006, Plaintiff visited the Marlton Center, showed the Release to the new district supervisor, Todd Richards, and informed him that she would be returning to work on January 8, 2007.  Mr. Richards responded that he would have to confer with his superiors.  On January 3, 2007, Decree called Nurse Sullivan and faxed her the Release.  According to Plaintiff, Nurse Sullivan informed her that she could not return to work until she was 100% healed and had spoken to District Human Resources Manager, David Jewell.

Decree spoke with Mr. Jewell several times in the days that followed.  In an initial conversation, Mr. Jewell asked Decree to explain the Release, to which Decree responded that she experienced frequent dizziness and was uncomfortable on major highways.  Mr. Jewell noted

that the limitations on her Release would make performing her job difficult.  Plaintiff countered

that managers do not perform heavy lifting and that her condition would improve over a short

period of time.  Plaintiff alerted Mr. Jewell that she was willing to return to any managerial

position available.  Mr. Jewell indicated that he would speak to Mr. Joe Ellis to ascertain if there

was a managerial opening in the industrial engineering department.

On January 17, 2007, Decree again spoke to Mr. Jewell.  This time he informed her that

he had not spoken to Mr. Ellis, that there were no positions available for Ms. Decree, and that

there was nothing he could do to help.  UPS terminated Plaintiff the following day upon the

expiration of the twelve month leave of absence period.

## II.      STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue

of material fact exists only if "the evidence is such that a reasonable jury could find for the non-

moving party."  Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986).  When the Court

weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in [her] favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving

for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477

U.S. at 331 (1986) (Brennan, J., dissenting)).  The moving party may satisfy this burden by either

(1) submitting affirmative evidence that negates an essential element of the nonmoving party's

claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to

establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  Corliss v. Varner, 2007 WL 2709661, at *1 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.   Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.    ANALYSIS

A.    Compliance with Rules of Civil Procedure

As an initial matter, the Court must address UPS's claim that Decree violated Local Rule of Civil Procedure 56.1 by submitting statements of undisputed facts that contain legal argument, lack citation to the record, and do not set forth facts in separately numbered paragraphs.

Local Rule of Civil Procedure 56.1 provides that:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion.  A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed. The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material fact, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

L. Civ. R. 56.1(a).  The purpose of these statements is to prevent the court "from having to drudge through deposition transcripts, expert reports, and lengthy contracts to determine the facts."  Comose v. N.J. Transit Rail Operations, Inc., No. 98-2345, 2000 U.S. Dist. LEXIS 20790, at *4 (D.N.J. Oct. 6, 2000).  Accordingly, "[t]he 56.1 statement is not a place for legal argument[.]"  Globespanvirata v. Texas Instrument, Inc., No. 03-5824, 2005 U.S. Dist. LEXIS 27820, at *4 (D.N.J. Nov. 15, 2005) (quotations omitted).

In this case, Plaintiff filed two Rule 56.1 statements, entitled "Statement of Core Material Incontrovertible Facts" and "Plaintiff's Counterstatement of Material Facts."  The Court agrees with UPS that both contain portions best characterized as legal argument rather than statement of fact.  Accordingly, the Court will disregard any legal argument encountered in Plaintiff's Rule 56.1 statements.  See Eckhaus v. Consol. Rail Corp., No. 00-5748, 2003 WL 23205042, at *6 (D.N.J. Dec. 24, 2003).  The Court further agrees with UPS that Plaintiff's "Counterstatement of Material Fact" is unwieldy at best and violates Rule 56.1's insistence that facts be set forth in separately numbered paragraphs and that factual allegations be supported with citation to the record.  At least one court in this District has considered factual denials unsupported by record

citation to constitute admissions.  See Hyland v. Am. Gen. Life Cos., No. 06-6155, 2008 WL 4308219, at *1 n.1 (D.N.J. Sept. 17, 2008) (citing Kautz v. Met-Pro Corp., 412 F.3d 463, 475 (3d Cir. 2005)).  The Court further notes, however, that UPS is not entirely blameless in this respect as it, on occasion, cites to exhibit pages not before the Court.  Accordingly, the Court reminds the parties that it will not consider any allegations of fact not supported by the record.

**B.      Disability Discrimination**

The LAD prohibits employment discrimination on account of disability.  Potente v. County of Hudson, 900 A.2d 787, 791 (N.J. 2006) (citing N.J. Stat. Ann. §§ 10:5-4.1 to 29.1 (West 2006)).  Under the LAD, there are two "distinct categories of disability discrimination claims," namely (1) failure to accommodate an employee's disability; and (2) disparate treatment. Tynan v. Vicinage 13 of Superior Court, 798 A.2d 648, 655 (N.J. Super. Ct. App. Div. 2002). Plaintiff asserts both claims.

New Jersey courts have adopted the burden shifting framework for analyzing discrimination claims articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Grigoletti v. Ortho Pharm. Corp., 570 A.2d 903, 906-07 (N.J. 1990); see, e.g., Victor v. New Jersey, 952 A.2d 493 (N.J. Super. Ct. App. Div. 2008) (analyzing failure to accommodate claim); Bell v. KA Indus. Servs., 567 F. Supp. 2d 701 (D.N.J. 2008) (analyzing disparate treatment claim).  This framework consists of three stages:

> First, the plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (quotation omitted).  This

tripartite framework shifts the burden of production from the plaintiff to the defendant and then

back again to the plaintiff.  However, "[w]hile the burden of production may shift, 'the ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff.'"  Id. (quoting Texas Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 252-53 (1981)).

        Although courts in New Jersey that have analyzed disability discrimination claims

pursuant to the LAD have "looked to the federal law as a key source of interpretive authority,"

New Jersey courts do not apply the McDonnell Douglas framework "literally, invariably, or

inflexibly."  Grigoletti, 570 A.2d at 906-07.  Instead, the courts have modified the analysis where

appropriate, most notably in defining the elements of a plaintiff's prima facie case.  Id. at 907

(citing Erickson v. Marsh & McLennan, 569 A.2d 793 (N.J. 1990)).

                    1.        Failure to Accommodate Claim

        UPS moves for summary judgment on Plaintiff's failure to accommodate claim arguing

that Plaintiff can establish none of the elements of her prima facie case.  Likewise moving for

summary judgment, Plaintiff argues that UPS failed to make reasonable accommodations for her

disability as a matter of law.

        The LAD imposes a duty upon employers to reasonably accommodate an employee's

disability.  Tynan, 798 A.2d at 655-56 (citations omitted).  Addressing the scope of this duty, the

Supreme Court of New Jersey has instructed that the LAD requires an employer to make

reasonable accommodation to a disabled employee's limitations unless doing so "would impose

an undue hardship on the operation of the business."[1]  Potente, 900 A.2d at 791 (citing N.J. Admin. Code § 13:13-2.5(b)).

To establish a prima facie case for failure to accommodate pursuant to the LAD, a plaintiff must establish that she (1) was disabled; (2) was qualified to perform the essential functions of the job, with or without accommodation, and (3) suffered adverse employment action because of the disability.  See Fulton v. Johnson & Johnson Pharm. Research and Dev., No. 05-819, 2008 WL 544668, at *12 (D.N.J. Feb. 26, 2008) (citation omitted).

At the outset, the Court notes that the parties do not dispute the third element of Plaintiff's prima facie case as Plaintiff was terminated from her employment.  See Linton v. L'Oreal USA, No. 06-5080, 2009 WL 838766, at *3 (D.N.J. Mar. 27, 2009) (finding plaintiff's termination constituted adverse employment action).  Neither do the parties appear to genuinely dispute whether Plaintiff meets the LAD's definition of disability.

The LAD defines a disability as a "physical disability . . . caused by bodily injury . . . and which shall include, but not be limited to, any degree of . . . lack of physical coordination . . . ." N.J. Stat. Ann. § 10:5-5(q).  As many courts have noted, the LAD defines the term disability "more broadly than the ADA's comparable definition."  E.g., Tynan, 798 A.2d at 655 (citing Leshner v. McCollisters Transp. Syst. Inc., 113 F. Supp. 2d 689, 692 n.2 (D.N.J. 2000)).

Here, the full thickness tear in Decree's shoulder and brachial plexus irritation in her arm – both of which required surgery or treatment – surely qualify as bodily injuries causing a degree

---

[1]  The relevant implementing regulations of the New Jersey Administrative Code provide that reasonable accommodations may include "job restructuring, part-time or modified work schedules or leaves of absence; [a]quisition or modification of equipment or devices; and [j]ob reassignment and other similar actions."  N.J. Admin. Code § 13:13-2.5(b) (2009).

of lack of physical coordination.  See Linton, 2009 WL 838766, at *3 (finding that a sprained

ankle qualifies as a disability under the LAD); Nieves v. Individualized Shirts, 961 F. Supp. 782,

796 (D.N.J. 1997) (finding that varicose veins may qualify as a disability under the LAD).  Thus,

the Court finds that Plaintiff was disabled for purposes of the LAD.  Accordingly, the Court turns

to the question of whether Plaintiff can show that she was qualified to perform the essential

functions of the job with or without reasonable accommodation.

Once an employee requests an accommodation, the LAD imposes a duty upon both the

employer and the employee to engage in an interactive process "to assist in the search for

appropriate reasonable accommodation."  Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).

As the Appellate Division of the New Jersey Superior Court has recently clarified, a plaintiff may

offer proof of an employer's failure to participate in good faith to support the second prong of her

prima facie case.[2]  Victor, 921 A.2d at 504.  An employee alleging that her employer failed to

engage in the interactive process must prove that "(1) the employer knew about the employee's

disability; (2) the employee requested accommodations or assistance for his or her disability; (3)

the employer did not make a good faith effort to assist the employee in seeking accommodations;

and (4) the employee could have been reasonably accommodated but for the employer's lack of

good faith."  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 319-20 (3d Cir. 1999).

### i.    Knowledge of Disability

UPS contends that it did not know that Decree had a disability because the information

---

[2]  The parties appear to have proceeded with the understanding that failure to participate
in the interactive process constituted a claim separate and distinct from a claim for failure to
accommodate.  Based upon the Appellate Division's recent guidance in Victor, this Court will
analyze these two allegations as a single claim.  See Linton, 2009 WL 838766, at *3.

about her, to which it had access, was insufficient for it to make a good faith determination of whether she was "disabled" for LAD purposes. UPS explains that the only information it possessed regarding Plaintiff's medical status was that contained in the Risk Track progress records, which was limited to "general information about medical events." (Def.'s Br. at 8.)

UPS does not dispute, however, that it had access to and did in fact review Plaintiff's Risk Track records. Nor can it dispute that these records contained reference to the facts that (1) Plaintiff was involved in a vehicle accident; (2) sustained a "full thickness tear" in her shoulder; (3) required surgery for the tear; (4) was diagnosed with brachial plexus irritation in the right arm, and that (5) her doctors recommended that she undergo several procedures before finally having surgery to correct the shoulder tear. Moreover, UPS does not dispute that it sent Plaintiff a letter on December 1, 2006 requesting medical documentation so that UPS could analyze Plaintiff's alleged request for a "job-related accommodation because of a self-reported physical or mental condition." (Def.'s Ex. 11.) Nor does UPS dispute that, before it terminated Decree, she furnished it with a note from her physician releasing her to work with certain limitations with respect to driving and lifting. Finally, UPS does not dispute that, shortly after faxing the Release to UPS, Plaintiff asked to be allowed to return to work subject to those limitations. On the basis of these facts, a reasonable jury could conclude that UPS knew that Decree suffered from a disability within the LAD's broad definition.[3]

---

[3] In its reply brief, UPS cites to Conneen v. MBNA Am. Bank, for the proposition that knowledge of Decree's disability cannot be attributed to UPS where it took Decree "at her word" that she was not disabled. 334 F.3d 318, 332 (3d Cir. 2003) (citing Taylor v. Principal Fin. Group, 93 F.3d 155, 163-64 (5th Cir. 1996)). In Conneen, an employer accommodated an employee's psychiatric disability by temporarily allowing that employee to report late to work as the employee transitioned to a lower dosage of anti-depressants. Id. at 322-24. Approximately a month after the expiration of the temporary accommodation, the employee began to again report

## ii.   Request for Assistance or Accommodation

UPS claims that Plaintiff never requested assistance or accommodation for her disability. To support this assertion, UPS points to Plaintiff's failure to comply with UPS's request for medical documentation and to the fact that Plaintiff admits that she never requested UPS to send her its form accommodation paperwork because she did not believe she was permanently disabled.  Plaintiff counters that her failure to respond to the request for paperwork, as well as her insistence that she did not need accommodations, stemmed from a sincere fear that UPS was trying to railroad her into forfeiting her rights under the LAD.  According to Plaintiff, UPS was essentially insisting that she document her medical condition at a time when her medical condition was in transition, and that such documentation would not reflect Plaintiff's capabilities after she had time to reasonably recover from her recent surgery.

In making a request for assistance or accommodation, "[t]he law does not require any formal mechanism or 'magic words.'"  Conneen, 334 F.3d at 332 (citing Taylor, 184 F.3d at 313).  Indeed, "circumstances will sometimes require 'the employer . . . to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.'"  Id. (citing Bultemeyer v. Fort Wayne Cmty. Sch., 100 F.3d 1281, 1285 (7th Cir. 1996)).  Still, "either by direct communication or

late for work.  Id.  When confronted, the employee did not offer her disability as the source of her tardiness, and the employer terminated the employee.  Id.  Under these circumstances, the Third Circuit held that the employer could not be charged with knowledge of the employee's disability because nothing suggested that the employee "was still suffering from the effects of her medication."  Id. at 332.  The case at bar is distinguishable from Conneen because the Risk Track records, in concert with Plaintiff's submission of the Release and telephone calls with Mr. Jewell and Nurse Sullivan requesting reinstatement with duty-limitations, suggest that UPS was, in fact, aware that Plaintiff was suffering from a disability.

other appropriate means, the employee 'must make clear that the employee wants assistance for his or her disability.'" <u>Jones v. United Parcel Serv.</u>, 214 F.3d 402, 408 (3d Cir. 2000).  This does not require "formalisms about the manner of the request," <u>Taylor</u>, 184 F.3d at 313, but rather that the employer have "enough information to know of 'both the disability and desire for an accommodation,' or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation," <u>Conneen</u>, 334 F.3d at 332 (citing <u>Taylor</u>, 184 F.3d at 313).  "The quantum of information that will be required will, therefore, often depend on what the employer already knows."  <u>Id.</u>

Here, UPS does not dispute that, before Plaintiff was terminated, she submitted the Release, which documented her limitations, and that Plaintiff requested to be permitted to return to work in any capacity consistent with her limitations and experience.  Thus, the Court notes that the parties do not really dispute the issue of whether a request was made.  Rather, the parties arguments here go to the more substantial issue in this case of whether Plaintiff can establish that UPS failed to engage in the search for reasonable accommodations in good faith, an issue to which the Court now turns.

### iii.    Good Faith Assistance

At the heart of the respective motions for summary judgment are the parties claims that the other did not participate in the search for a reasonable accommodation in good faith.

Once an employee makes a request for an accommodation, the employer and employee must engage in a flexible, informal interactive process to determine the possibility of accommodation.  <u>Gomez v. Con-Way Cent. Express Inc.</u>, No. 06-5352, 2009 WL 799243, at *9 (D.N.J. 2009) (citing <u>Jones v. Aluminum Shapes, Inc.</u>, 772 A.2d 34, 40 (N.J. Super. Ct. App.

Div. 2001).  "In this interactive process, both employer and employee must communicate with each other to 'identify the precise limitations resulting from the disability and potential reasonable accommodation that could overcome those limitations.'"  Id.  The interactive nature of the process is imperative "because each party holds information the other does not have or cannot easily obtain."  Taylor, 184 F.3d at 316.  For example, "employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company.  Thus the interactive process may often lead to the identification of a suitable position.'"  Id. (quoting Mengine, 114 F.3d at 420).

Good faith is essential to the accommodation process envisioned by the LAD. Accordingly, both the employer and the employee share the duty to participate in the interactive process in good faith.  Id.  Elaborating on this requirement, the Third Circuit has noted that:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer . . . [B]oth parties bear responsibility for determining what accommodation is necessary . . . [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.  Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary.  A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, court should attempt to isolate the cause of the breakdown and then assign responsibility.

Id. at 312 (citing Bultemeyer, 100 F.3d at 1285).

UPS contends that Decree is responsible for the breakdown in the interactive process because she ignored UPS's letters requesting medical records and authorization.  UPS explains that it acted in good faith by identifying her as a person who might require accommodations and

16

by sending her the letter request.  UPS also relies on the fact that it followed-up with Decree in regard to the Release by way of several telephone conversations between Mr. Jewell and Decree that transpired after Plaintiff's failure to respond and prior to her termination.

On the other hand, Decree lays blame for the breakdown squarely at the feet of UPS. Although she did not use UPS's forms or immediately respond to their requests for medical information, Decree insists that she attempted to meet UPS halfway.  Plaintiff points to the fact that she submitted the Release to UPS and contacted numerous UPS managerial and human resources personnel, including Mr. Jewell and Nurse Sullivan, prior to her termination in an attempt to gain authorization to return to work in her previous position with the enumerated limitations.  Plaintiff also points to the fact that she told Mr. Jewell that she was amenable to resuming her employment in any available managerial capacity, that Mr. Jewell agreed to inquire with Mr. Ellis about an opening in engineering, and that Mr. Jewell never did so.  In essence, Plaintiff argues that UPS refused her accommodation request because she chose to initiate the interactive process at a time, and in a manner, inconsistent with the particular procedures UPS itself developed to effect compliance with the LAD.

In their respective motions for summary judgment, both parties ask this court to decide, as a matter of law, that they participated in the interactive process in good faith.  UPS attempts to do so by analogizing to the case of Sturm v. UAL Corp., No. 98-264, 2000 WL 1300396 (D.N.J. Sept. 5, 2000).  In Sturm, an employer took the first step in the interactive process by requesting the disabled employee to provide the employer with a narrative medical statement from his doctors.  Id. at *13.  The employee did not comply with this request, noting only that other employees had been accommodated without documentation.  The employee was subsequently

terminated.  Id.  Granting summary judgment for the employer on the employee's failure to accommodate claim, the district court concluded that the employer acted in good faith because the employee failed to submit the requested medical information.  Id.

The Court notes that Sturm is not the only decision of a court in this District to address the issue of whether an employee's failure to timely respond to an employer's reasonable request for medical information constitutes bad faith as a matter of law.  In Gomez v. Con-Way Central Express, Inc., for example, an injured employee initiated the interactive process with his employer by submitting a physician's note documenting his injury.  2009 WL 799243, at *10. The injured employee supplemented the physician's note with two additional medical reports. Id.  The employer then sent the employee a request for further medical information, which the employee never satisfied.  Id.  Without giving any consideration to the employee's request for reassignment, the employer terminated the employee.  Id.

The court denied the employer summary judgment on the employee's failure to accommodate claim under the circumstances, citing the "difficulties inherent in definitively concluding that one party was completely blameless" during the course of a lengthy interactive process.  Id. at *9.  On the one hand, the court noted that a jury could find that the employee acted in bad faith for failing to fully comply with reasonable information requests.  Id. at *11-12. On the other hand, the court noted that a jury could find that the employer acted in bad faith for failing to consider the possibility of transfer.  Id.

It is true that Decree did not respond to UPS's request for medical information and authorization by completing and returning the UPS forms.  In that respect, this case is similar to Sturm.  It is also true, however, that Plaintiff (1) provided UPS with medical information

18

pertaining to her limitations in the form of the Release before her ultimate termination and within a month of UPS's initial request; (2) requested repeatedly for permission to return to work with limitations in her previous managerial position; and (3) requested a transfer to an open managerial position within the engineering department or in any other department.  Moreover, if Plaintiff's testimony is believed, Mr. Jewell promised to inquire into the possibility of a reassignment in engineering, but failed to do so.  The fact that Plaintiff took these additional proactive measures to facilitate the interactive process and the possibility that Mr. Jewell failed to consider reassignment, bring this case closer to the facts of Gomez than to Sturm.

The Court notes that, on a motion for summary judgment, the moving party must clear a high hurdle to establish good faith as a matter of law.  Indeed, it is well settled that "summary judgment should not ordinarily be granted when the action entails a determination of a state of mind such as bad faith."  Thorson v. PSEG Power, LLC, No. L-6448-03, 2009 WL 47410, at *7 (N.J. Super. Ct. App. Div. Jan. 9, 2009) (citing Auto Lender v. Gentilini Ford, 854 A.2d 378 (N.J. 2004)).  Here, a reasonable jury could conclude that Plaintiff caused the breakdown by sandbagging the search for accommodations in a futile attempt to delay the inevitable conclusion that she was unfit for continued employment at UPS.  Conversely, a reasonable jury could also conclude that UPS caused the breakdown by forcing the Plaintiff to choose between UPS's version of the interactive process envisioned by the LAD, or no interaction at all, and effectively aborting the search for an accommodation when the Plaintiff did not play by UPS's rules.  Accordingly, there exists a genuine issue of fact regarding Defendant's good faith.

### iv.    Possibility for Reasonable Accommodation

UPS argues that, even if it acted in bad faith, Plaintiff's reasonable accommodation claim

must fail because Plaintiff cannot establish that a reasonable accommodation was possible.

It is well settled that the LAD does not require an employer to provide accommodations "where it can reasonably be determined that an . . . employee . . . cannot perform the essential function of the job even with reasonable accommodation." Potente, 900 A.2d at 791 (quoting N.J. Admin. Code § 13:13-2.8(a)). "The employer bears the burden of establishing the necessity of certain functions to the job in question," and courts need not look to any "strict set of evidence" to make the determination. Sturm, 2000 WL 1300396, at *5 (citing Simon v. St. Louis City, 735 F.2d 1082, 1084-85 (8th Cir. 1984). Rather, courts should focus on the "actual functioning of the enterprise involved." Id. (citing Hall v. United States Postal Serv., 857 F.2d 1073, 1079 (6th Cir. 1988)).

Arguing that Plaintiff could not perform the essential functions of her job, UPS points to a UPS-created document that lists various functions and sub-functions considered by UPS to constitute the essential job functions of "Operations Supervisors/Managers." Among the seventeen primary functions listed are (1) "[m]ust be able to travel by car and plane to attend meetings at other locations and call on non-UPS locations and customers"; and (2) "[l]ift, lower, push, pull, leverage, and manipulate equipment and/or packages weighing up to 70 pounds." (Def.'s Ex 5.) UPS further notes that Decree admitted in her deposition that she could not lift seventy pounds and that her driving was limited to local driving, which Plaintiff self-defined as within twenty miles. UPS also points to post-termination medical documentation that indicates that Plaintiff's doctors thought her "target date for full recovery" was "never," and that they recommended "no work" for Plaintiff.

Plaintiff takes issue with UPS's definition of the essential functions of her job. Relying

20

on her actual experience as a manager at UPS for nine years, Plaintiff insists that managers are rarely required to lift packages; rather, that function is reserved for supervisors and other employees subordinate to her.  Although driving is certainly required, more than local driving is not an essential manager function because it is not required on a regular basis and because managers often car-pool to particularly distant locations.

The Court concludes that there exists a genuine dispute on the issue of whether Plaintiff could conduct the essential functions of her job.  Although courts rightly look to the employer's written job descriptions to determine a job's essential functions, "[t]he actual work experience of incumbents in the position, including the plaintiff if applicable, is also probative."  Sturm, 2000 WL 1300396, at *5.  Here, the employer's written job description and Plaintiff's account of her actual experience differ substantially.  With respect to the required lifting, UPS's insistence that a manager at a package handling facility must be able to lift heavy packages strikes the Court as a reasonable conclusion.  On the other hand, Plaintiff's assertion that the lifting requirements of the job description document apply more to persons at the level of supervisor and below also strikes the Court as reasonable and consistent with UPS's own documents.  Thus, this case is unlike those cases in which it was patently obvious to the court that the plaintiff could no longer perform the essential functions of his job.  E.g., Raspa v. Office of Sheriff of County of Gloucester, 924 A.2d 435, 444 (N.J. 2007) (holding that a county jail corrections officer could not perform the essential functions of his job where his disability precluded him from any contact with inmates).

Plaintiff's admission that driving constituted a significant part of her job – sometimes requiring her to travel several hundred miles in a day – does come closer to establishing that non-

local driving was an essential element of her job.  Plaintiff does not admit, however, that non-local driving was regularly required.  Given the fact that the frequency with which an employee is required to perform a given employment function is one factor in the essential functions analysis, it is not totally clear to the Court whether the driving Plaintiff was unable to do was, in fact, essential.  See Sturm, 2000 WL 1300396, at *5 (citing 29 C.F.R. App. 1630.2(n)) ("Obviously where a function constitutes a large percentage of the working day, it will more likely be considered essential.").

Even if non-local driving was essential, the fact that she performed her job for over a month after the accident and before she went on disability supports a reasonable inference that she was capable of doing it one year later at the time of her termination and after corrective surgery.  See id. at *9 ("The plaintiff's disability must be assessed as of the time he was terminated.") (citing Simmerman v. Hardee's Food Sys. Inc., 1996 WL 131948, at *5 (E.D. Pa. 1996), aff'd, 118 F.3d 1578 (3d Cir. 1997) (without opinion)).  Moreover, even if the jury finds UPS's post-termination medical documentation probative of her medical status at the time of her termination, the fact that Decree's own supervisor allegedly pressured her to continue working instead of filing for workers' compensation in the days that followed her accident cuts strongly against a finding on a motion for summary judgment that Decree was unable to perform the essential functions of her job.  Finally, Plaintiff's testimony that it was the practice of the eight managers at the Marlton Center to car-pool to off-site meetings supports the inference that Plaintiff could have performed any essential driving functions of her job *with* reasonable accommodations.  Accordingly, a genuine issue of fact remains with respect to the question of whether Plaintiff could have performed the essential functions of her job with reasonable

accommodation.[4]

In light of the foregoing analysis, the Court finds that both parties have satisfied their burdens of production.  Plaintiff's prima facie case is satisfied because her evidence supports a reasonable conclusion that UPS did not participate in the interactive process in good faith, which in turn supports the conclusion that Plaintiff was qualified to perform the essential functions of her job with or without reasonable accommodations.  See Victor, 952 A.2d at 504.  UPS's burden of coming forward with a legitimate nondiscriminatory reason for Plaintiff's termination is satisfied by its explanation that it fired Plaintiff because her administrative leave expired, she did not participate in the accommodation process, and in any event, no reasonable accommodation was possible.  Finally, Plaintiff's burden of coming forward with evidence of pretext is satisfied because her evidence supports the reasonable conclusion that UPS prematurely aborted the accommodation process, despite Plaintiff's ability to perform the

---

[4] UPS also argues that Plaintiff should be estopped from now claiming that she could perform the essential functions of her job at the time of her termination because of a statement Plaintiff made under oath in response to interrogatories served upon her in a personal injury lawsuit she has brought against the driver of the vehicle with which she collided.  Plaintiff stated:

> At the time of the accident in question, [P]laintiff was employed by UPS . . . .  As a result of the accident in question, Plaintiff was totally disabled and unable to work from the day of the accident, 12/9/05, through 1/18/07 at which time she was released to go back to work with restricted/light duty.  Unfortunately, her employer was unable to accommodate restricted/light duty, and the [P]laintiff remains unable to work through the present.  (Def.'s Ex. 28.)

This statement does not estop Plaintiff from claiming, as she does here, that she was able to perform the essential functions of her job at the time of her termination with reasonable accommodation.  Plaintiff's sworn statement appears to stand for the proposition that she was unable to work *without* an accommodation.  Such a statement does not necessarily contradict her contentions before this Court that she could have worked *with* an accommodation.  See, e.g., Jacques v. Berlin Borough Bd. of Educ., No. 04-1688, 2005 WL 2656674 (D.N.J. Oct. 17, 2005).

essential function of the job.  Accordingly, UPS's motion for summary judgment will be denied.[5]

At the same time, Plaintiff has failed to show that UPS's behavior constituted bad faith per se or that she was able to perform the essential functions of the job as a matter of law.  Thus, the Court will deny her cross-motion for summary judgment as well.

### 2.    Disparate Treatment Claim

In analyzing a claim for discrimination on the basis of a perceived disability under the LAD, courts use an identical process to that of the ADA.  Lawrence v. Nat'l Westminster Bank New Jersey, 98 F.3d 61, 70 (3d. Cir. 1996).  This analysis proceeds under the three step McDonnell Douglas framework described above.  Bell, 567 F. Supp. 2d at 706.

### i.    Plaintiff's Prima Facie Case

To establish a prima facie case of discriminatory discharge on the basis of disability, a plaintiff must show that "(1) [s]he is disabled or perceived to have a disability; (2) [s]he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) [s]he was fired; and (4) the employer sought someone else to perform the same work.  Id. (citing Muller v. Exxon Research & Eng'g Co., 786 A.2d 143 (N.J. Super. Ct. App. Div. 2001)).

Plaintiff alleges only that UPS perceived her as having a disability.  In order to show that one is "perceived to have" a disability, one must show that the employer "entertain[ed]

---

[5]  In this respect, the Court's decision comports with the Third Circuit's warning that "[w]hen an employee has evidence that the employer did not act in good faith in the interactive process . . . we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect.  To [do so] would effectively eliminate the requirement that employers must participate in the interactive process."  Taylor, 184 F.3d at 318.

misperceptions about the individual, either believing that the individual has a substantially limiting impairment that he or she does not have or that the individual has a substantially limiting impairment when, in fact, the impairment is not as limiting as the employer believes." Eckhaus v. Consol. Rail Corp., No. 00-5748, 2003 WL 23205042, at *9 (D.N.J. Dec. 24, 2003) (citing Sutton v. United Air Lines Inc., 527 U.S. 471, 487 (1999)). "Even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." Dean v. Pocono Med. Ctr., 142 F.3d 138, 144 (3d Cir. 1998).

In this case, Plaintiff has completely failed to come forward with any evidence that UPS misperceived the existence, severity, or nature of her impairment.  In fact, the record is clear that UPS's perception of Plaintiff's physical condition was at all times consistent with Plaintiff's self-description.  To be sure, Plaintiff's self-description has changed over time, but Plaintiff has pointed to no evidence that UPS's perception of her physical condition did not change just as quickly.  Thus, the Court finds that Plaintiff has not made out her prima facie case because she does not point to evidence from which a reasonable jury could infer that UPS perceived her as disabled within the meaning of the LAD.  Accordingly, the Court will grant UPS's motion for summary judgment on Plaintiff's disparate treatment claim and deny Plaintiff's cross-motion.

C.     **Sex Discrimination**

Courts use an identical process for analyzing gender discrimination claims brought pursuant to Title VII and the LAD.  See Grigoletti, 570 A.2d at 907 ("In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil

Rights Act of 1964[.]"); see also Waldron v. SL Indus., 56 F.3d 491, 503 (3d Cir. 1995) (stating that the LAD is "governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964") (quotation omitted).  For such claims, the Court again relies on the McDonnell Douglas burden-shifting framework outlined above.

### 1.    Plaintiff's Prima Facie Case

In order to set forth a prima facie case of discrimination, a plaintiff must meet a four-factor test.  In this case, Plaintiff must show that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) action occurred under circumstances giving rise to an inference of discrimination."  Christopher v. New Jersey, No. 03-2589, 2005 U.S. Dist. LEXIS 16414, at *12 (D.N.J. Aug. 3, 2005) (citing Jones, 198 F.3d at 410-11).

The parties do not dispute that Plaintiff makes out the first two prongs of her prima facie case as Decree is female and was terminated.  Moreover, in light of this Court's conclusion that Plaintiff may have been qualified to perform the essential functions of her employment, the Court finds that Plaintiff has satisfied her burden of showing, for purposes of this motion, that she remained qualified.  To establish the final element of her prima facie case, Plaintiff alleges several specific instances where male employees at the Marlton Center, who were out of work on disability leave, were returned to their former positions with appropriate accommodations; whereas, Plaintiff was not accommodated and not allowed to return.  Such assertions are sufficient to meet the final prong of the prima facie analysis.  See Amato v. Verint Sys. Inc., No. 04-3489, 2007 WL 604804, at *4 (D.N.J. Feb. 16, 2007).

2.     **UPS's Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination**

Because Plaintiff has satisfied the first stage of the <u>McDonnell Douglas</u> framework, this Court now reaches the second stage of the test.  At this stage, the burden of production shifts to UPS to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." <u>Fuentes v. Perksie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  This burden has been characterized as "relatively light." <u>Id.</u>  Moreover, "the employer need not prove that the tendered reason actually motivated its behavior[.]" <u>Id.</u>

UPS asserts that Plaintiff was administratively terminated pursuant to a UPS policy providing for administrative terminations of employees whose employment leaves exceed twelve months and because Plaintiff did not comply with UPS's procedures for requesting accommodation.  As most, if not all, of Plaintiff's arguments center around the question of pretext, it appears that Plaintiff does not challenge UPS's ability to meet their burden under this step.  The Court therefore finds that UPS has met its burden to produce evidence to show that it had a legitimate, nondiscriminatory reason for terminating Plaintiff.

3.     **Plaintiff's Burden of Showing Pretext**

Having reached the final stage of the <u>McDonnell Douglas</u> framework, this Court must now inquire into whether Plaintiff can demonstrate, by a preponderance of the evidence, that UPS's reasons were pretextual.  To satisfy this burden, Plaintiff must introduce "sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional . . . discrimination." <u>Jones</u>, 198 F.3d at 412.  Phrased differently, Plaintiff "must point to some evidence, direct or circumstantial,

from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764.

Applying this test, a court is ordinarily faced with the difficulty of determining the extent to which a plaintiff must discredit a defendant's proffered reasons. Although the test is somewhat ambiguous, the Third Circuit has defined it as requiring that "the non-moving plaintiff . . . demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)).

To show pretext, Plaintiff again offers the names of disabled male employees who were accommodated and allowed to return to work. UPS counters with the testimony of Barbara Goherty, UPS's Metro Philadelphia Employee Relations Manager that, unlike Decree, each of the identified male employees engaged in the UPS accommodation process. Ms. Goherty also testified that, unlike Plaintiff, none of the identified male employees were on leave for more than six months; two returned in less than three. Finally, Ms. Goherty testified that, in the past three years, UPS has terminated eleven other management level employees for remaining on leave in excess of twelve months; five employees were male and six were female.

At the pretext stage, Plaintiff has the burden of proving that "similarly situated persons were treated differently." Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998) (citing

28

Burdine, 450 U.S. at 258).  The similarly situated analysis requires the Court to focus on the criteria identified by the defendant as the reasons for the termination.  Id. at 647 (citing Ezold, 983 F.2d at 528).  Thus, the Court must focus on the length of the identified male employees' leaves of absence and their compliance with UPS's accommodation procedures.  Besides the bald allegation that Ms. Goherty is somehow mistaken, however, Plaintiff is unable to muster any evidentiary support for the proposition that, like Plaintiff, the identified male employees either failed to engage in UPS's accommodation process or remained out on disability leave for almost a year.  On the basis of Plaintiff's evidence, no reasonable jury could infer that sex discrimination was more likely than not the true reason for UPS's actions.  Accordingly, the Court will grant UPS's motion for summary judgment with respect to Plaintiff's sex discrimination claim.

###     D.     Retaliation

Plaintiff alleges that she was terminated in retaliation for filing a workers' compensation claim.  To establish a prima facie case of retaliation, a plaintiff must show that she (1) made a claim for workers' compensation benefits; (2) suffered adverse employment action; and that (3) a causal connection existed between the employee's protected activity and the employer's decision to take adverse action.  Krause v. Am. Sterilizer, Co., 126 F.3d 494, 500 (3d Cir. 1997).  If the plaintiff establishes the prima facie case, the burden shifts to the employer to proffer a legitimate non-discriminatory reason.  Should the defendant do so, the burden shifts again to the Plaintiff to show pretext.  See Morris v. Siemens Components, Inc., 928 F. Supp. 486, 493 (D.N.J. 1996).  In analyzing retaliation cases under the LAD, New Jersey courts look again to federal law to supply the analytical framework and standards.  See id. (citing Abrams v. Lightolier, Inc., 50 F.3d 1204, 1212 (3d Cir. 1995)).

The first two prongs of Plaintiff's prima facie case are not in dispute.  The question before the Court is whether Plaintiff can show that her termination was caused by UPS's intent to punish her for making a workers' compensation claim.  See Ferra v. Potter, 05-5734, 2008 WL 3843534, at *6 (D.N.J. Aug. 14, 2008) (citing Jensen v. Potter, 435 F.3d 444, 449 n.2 (3d Cir. 2006)).  To establish the required causal connection, Plaintiff must show either (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing."  Griesbaum v. Aventis Pharm., 259 Fed. Appx. 459, 467 (3d Cir. 2007) (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).  "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation."  Id. (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).

By her own admission, Plaintiff "cannot point to any direct statement, nor to temporal proximity between the corporate dissatisfaction with a manager filing a Workers' Compensation claim and [Plaintiff's] termination."[6]  (Pl.'s Br. at 39.)  Nonetheless, Plaintiff argues that four pieces of evidence give rise to the inference of causation, namely (1) Mr. Carlino encouraged her to refrain from making a workers' compensation claim; (2) Mr. Carlino made an offensive phone call to Plaintiff threatening her if she filed for benefits; (3) Nurse Sullivan told Plaintiff to apply for disability under the STD plan; and (4) UPS allegedly failed to comply with N.J. Stat. Ann. § 34:15-96 to complete a first injury report.

---

[6]  Plaintiff's admission is on point as this Court would have a difficult time finding that the year-long interval between Plaintiff's filing and termination gave rise to the inference of causation.  Courts in this jurisdiction have not been hesitant to note that such year-long intervals do not give rise to an inference of causation.  E.g., Griesbaum, 259 Fed. Appx. at 467.

The Court finds that a jury could not reasonably infer the requisite causal connection from the evidence proffered by Plaintiff on this point.  First, no jury could reasonably infer that UPS intended to retaliate against Plaintiff on the basis of the isolated remarks of a supervisor who was subsequently transferred out of Plaintiff's chain of command and who played no role in Plaintiff's ultimate termination, which occurred over a year after Plaintiff's accident.  Second, although Plaintiff urges this Court to find a reasonable inference of causation from the alleged fact that Mr. Carlino "required" Plaintiff to delay filing for workers' compensation, Plaintiff's own testimony belies such an inference.  When pressed to explain why she delayed filing for workers' compensation, Plaintiff admits that she did not file because she wanted to preserve the Marlton Center's impeccable safety record and because she felt that the filing of workers' compensation claims was beneath her station as a manager.  Thus, Plaintiff's own description of her reasons is not consistent with antagonism.  Finally, the Court is at a loss to explain how Plaintiff's remaining evidence on this point would support the inference of causation.  At bottom, Plaintiff's belief that she was the subject of retaliation seems to rest solely on her contention that "people do not act for no reason at all."  (Id.)  Be that as it may, such a bald allegation is insufficient to withstand summary judgment.

Accordingly, the Court will grant Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

### E.      Breach of Employment Contract

New Jersey law construes certain employment policies articulated in widely-distributed employment manuals as creating enforceable contracts between employer and employee.  See

Byrd v. Fed. Express Corp., No. 05-2648, 2008 U.S. Dist. LEXIS 16891, at *16 (D.N.J. Mar. 4, 2008) (citing Woolley v. Hoffmann La-Roche, 491 A.2d 1257 (N.J. 1985)). Courts have extended this treatment to unwritten employer policies that are orally articulated, or "otherwise expressed," to employees. Shebar v. Sanyo Bus. Sys., 526 A.2d 1144, 1149 (N.J. Super. Ct. App. Div. 1987). The critical question is not the form by which the employer expresses the policy, but rather the "reasonable expectations of the employees." Witkowsk v. Lipton, 643 A.2d 546, 550 (N.J. 1994).

Plaintiff's breach of contract claim is predicated upon an "oral, but well known policy at UPS that managerial employees are provided job protection during an absence of twelve months following illness or injury." (Pl.'s Br. at.8.) As evidence of the oral policy, Decree points to a provision of the FBP entitled "Your Employment Status," which provides, in pertinent part, "[i]f you are absent from your regular occupation for twelve months, you will be administratively separated from employment, regardless of your status on [short term or long term disability]." (Id. at 9.) Plaintiff also points to two conversations between herself and Mr. Carlino in January and May of 2006 during which he assured Decree that she could return to her job. Finally, Plaintiff points to the way UPS handled the reinstatement of two employees – Mr. Motiel and Mr. Lubas – who returned to work at UPS after taking periods of disability leave.

As the Appellate Division observed in Shebar v. Sanyo Business Systems, oral policy statements made by a plaintiff's superior are probative of the existence of enforceable company policy, provided the "plaintiff is able to prove that their statement constituted an accurate representation of policy which they were authorized to make." 526 A.2d at 1149. In determining the existence of an oral policy, "[i]t is enough that the employee reasonably believes that a

32

particular personnel policy has been established and is applied consistently and uniformly to each employee." Gilbert v. Durand Glass Mfg., 609 A.2d 517, 522 (N.J. Super. Ct. App. Div. 1992) (quoting Toussaint v. Blue Cross & Blue Shield of Mich., 292 N.W.2d 880, 892 (Mich. 1980)).

Here, neither party seems to dispute that Plaintiff believed UPS adhered to a policy of holding positions open for employees on extended leave. Thus, the Court must look to see if Plaintiff has come forward with evidence that could support the reasonableness of that belief. Here, Plaintiff has failed to do so. First, the plain language of the FBP does not expressly grant employees the right to take twelve months of leave; it simply indicates what actions UPS will take, as a matter of course, after an employee has been on leave for twelve months. Second, UPS records do not indicate that it held open the positions of Mr. Motiel and Mr. Lubas for the full twelve months. In fact, those records indicate that Mr. Motiel returned from leave in approximately three months and that Mr. Lubas did so in approximately six. Although Plaintiff alleges that Mr. Carlino promised to keep her job open, she does not point to any evidence that he made the comment in the context of expressing an unwritten company policy. Also, Plaintiff admits that Mr. Carlino did not make any promises to her at any point after the four month mark of her leave and that the supervisor who replaced Mr. Carlino never repeated any of Mr. Carlino's promises.

In light of these facts, Plaintiff's evidence does not support the inference that UPS maintained an oral policy of holding jobs open for the entire twelve month period. As UPS explains in its papers, the longer the term of the employee's leave of absence, the greater the company's need is to find long-term replacements. From Plaintiff's evidence, a jury might reasonably conclude that UPS had an unwritten company policy of holding positions open

temporarily.  Such a conclusion is supported by the FBP read in light of Mr. Carlino's promises

and is corroborated by the experience of Mr. Motiel and Mr. Lubas.  But, this is as far as

Plaintiff's evidence reasonably goes.[7]  Accordingly, the Court finds that no reasonable jury could

conclude that UPS had a company-wide policy of holding disabled employee's jobs open for the

full twelve months of their leaves of absence.  Thus, the Court will grant UPS's motion for

summary judgment and deny Plaintiff's motion on Plaintiff's breach of contract claim.


Dated:   9-18-2009                                         /s/ Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge

---

[7]  Plaintiff's papers also claim that UPS's ADA Compliance Manual articulates a
contractually enforceable employment policy.  The Court disagrees.  The provision cited by
Plaintiff provides that "the manual suggests recommended but flexible procedures to encourage
the prompt and equitable resolution of all requests for accommodation."  (Pl.'s Ex. 18 at 1.)
Plaintiff does not cite from the lines that follow, which provide that "nothing in this manual is
intended to constitute a contractual obligation, and individuals are entitled to no contractual
rights or guaranteed procedures as a result of this manual that they are not otherwise entitled to as
a matter of law."  (Id.)  Courts applying New Jersey law have consistently held that "clear and
prominent" waivers to this effect prevent the underlying employment policies from forming the
basis of an implied contract.  E.g., Mardini v. Viking Freight, Inc., 92 F. Supp. 2d 378, 382-83
(D.N.J. 1999) (citing Whoolley, 491 A.2d 1257).  Moreover, disclaimers present on the initial
page of employment manuals are "clear and prominent."  Id. at 383 (citing Falco v. Cmty. Med.
Ctr., 686 A.2d 1212 (1997)).  Thus, Decree cannot rely on the ADA Compliance Manual as the
source of a contractually enforceable employment policy.